1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7    PAULA ANDREA SALCEDO ACEROS,          Case No. 25-cv-06924-EMC   (EMC)

8                      Plaintiff,

9            v.                             **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

10   POLLY KAISER, et al.,

11                     Defendants.          Docket No. 4

12
13

14          Petitioner Paula Andrea Salcedo Aceros is an asylum seeker who fled to the United States

15   in June, 2024.  After being briefly detained upon entry, she was released by border agents on her

16   own recognizance.  Since that time, she has abided by the conditions of her release and filed a

17   timely application for asylum.  On August 15, 2025, after Ms. Salcedo Aceros appeared at the San

18   Francisco Immigration Court for a scheduled hearing, she was arrested by Immigration and

19   Customs Enforcement ("ICE") agents and detained.  The same day, Ms. Salcedo Aceros filed a

20   petition for a writ of habeas corpus and a motion for a temporary restraining order.  On August 16,

21   the Court issued the TRO and ordered the Government to show cause why a preliminary

22   injunction should not issue.  The Court now **GRANTS** the preliminary injunction.

23
24
25
26
27
28

United States District Court
Northern District of California

United States District Court
Northern District of California

# I.     STATUTORY BACKGROUND

The detention and removal of inadmissible noncitizens in the United States is governed by a complex statutory framework.

## A.     Full Removal Proceedings and Discretionary Detention (§ 1226)

The "usual removal process" involves an evidentiary hearing before an immigration judge. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). Proceedings are initiated under 8 U.S.C. § 1229(a), also known as "full removal," by filing a Notice to Appear with the Immigration Court. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 520 (BIA 2011). Section § 1226 provides that while removal proceedings are pending, a noncitizen "may be arrested and detained" and that the government "may release the alien on . . . conditional parole." § 1226(a)(2); *accord Thuraissigiam*, 591 U.S. at 108 (during removal proceedings, applicant may either be "detained" or "allowed to reside in this country"). When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)). A noncitizen will be released if he or she "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id.* (citing 8 C.F.R. § 236.1(c)(8)).

"Federal regulations provide that aliens detained under §1226(a) receive bond hearings at the outset of detention." *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 CFR §§236.1(d)(1)). If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order his or her release. *Diaz*, 53 F.4th at 1197 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). Once released, the noncitizen's bond is subject to revocation. Under 8 U.S.C. § 1226(b), "the DHS has authority to revoke a noncitizen's bond or parole 'at any time,' even if that individual has previously been released." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019). However, if an immigration judge has determined the noncitizen should be released, the DHS may not re-arrest

that noncitizen absent a change in circumstance. *See Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021). Where the release decision was made by a DHS officer, not an immigration judge, the Government's practice has been to require a showing of changed circumstances before re-arrest. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017).

B.     Expedited Removal and Mandatory Detention (§ 1225)

While "§1226 applies to aliens already present in the United States," U.S. immigration law also "authorizes the Government to detain certain aliens seeking admission into the country under §§1225(b)(1) and (b)(2)," a process that provides for expedited removal. *Jennings*, 583 U.S. at 303 (2018). Under §1225, a noncitizen "who has not been admitted or who arrives in the United States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). For certain applicants for admission, 8 U.S.C. § 1225 authorizes "expedited removal." § 1225(b)(1). § 1225(b)(1) provides that:

> "If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) [8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7)], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 [8 USCS § 1158] or a fear of persecution."

Sections 8 U.S.C. § 1182(a)(6)(C) and 1182(a)(7) respectively refer to noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. Clause (iii) of § 1225(b)(1) allows the Attorney General (who has since delegated the responsibility to the Department of Homeland Security Secretary) to designate for expedited removal noncitizens "who ha[ve] not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." § 1225(b)(1)(A)(iii)(II).

To summarize, under § 1225(b)(1), two groups of noncitizens are subject to expedited removal. First, there are "arriving" noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. The implementing agency regulations define "arriving

alien" as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2 .[1]  The second group – designated noncitizens – includes noncitizens who meet all of the following criteria: (1) they are inadmissible due to lack of a valid entry document or misrepresentation; (2) they have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) they are among those whom the Secretary of Homeland Security has designated for expedited removal. *Thuraissigiam*, 591 U.S. at 109; § 1225(b)(1).

"Initially, DHS's predecessor agency did not make any designation [under (3)], thereby limiting expedited removal only to 'arriving aliens,'" that is, noncitizens encountered at ports of entry. *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 U.S. Dist. LEXIS 169432, at *14 (D.D.C. Aug. 29, 2025).  In the following years, DHS extended by designation expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days. *Id.*  This was the status quo until January, 2025, when the Department of Homeland Security revised its § 1225 designation to "apply expedited removal to the fullest extent authorized by statute."  Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025).  Under this designation, expedited removal applies to noncitizens encountered *anywhere* within the United States, who have been in the United States for less than two years and are inadmissible for lack of valid documentation or misrepresentation.  In short, expedited removal was expanded to apply for the first time to vast numbers of noncitizens present in the interior of the United States.

---

[1] The full definition reads: "Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked. However, an arriving alien who was paroled into the United States before April 1, 1997, or who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under section 235(b)(1)(A)(i) of the Act."

Under the expedited removal statute § 1225(b)(1), if an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). If the asylum officer determines that the applicant has a "credible fear," the applicant "receive[s] 'full consideration' of his asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110. If the officer determines there is no "credible fear," the officer "shall order the alien removed from the United States without further hearing or review." § 1225(b)(1)(B)(iii). However, the officer's decision may be appealed by the applicant to an immigration judge, who must conduct the review "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* Detention under § 1225(b)(1) is "mandatory" "pending a final determination of credible fear of persecution and if found not to have such a fear, until removed." *Id.* (citing §1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.")

§ 1225 also contains a provision that applies to applicants for admission not covered by §1225(b)(1). *Jennings*, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [full removal proceedings] of this title." § 1225(b)(2). In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending. This is in contrast to the default detention regime under § 1226(a), which allows for discretionary release and review of detention through a bond hearing.

C.    The Government's Recent Change in Position

Until this year, the DHS has applied §1226(a) and its discretionary release and review of detention to the vast majority of noncitizens allegedly in this country without valid documentation.

United States District Court
Northern District of California

This practice was codified by regulation.  The regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") state that "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997).  In fact, the government has conceded in other contexts that "DHS's long-standing interpretation has been that 1226(a) [discretionary detention] applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended." Dkt. No. 17 (citing Solicitor General, Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954)).  And in its briefing before this Court, the Government acknowledges that "until recently," it considered § 1226(a) to be an available detention authority for noncitizens who might also be subject to § 1225.  Dkt. No. 15 at 6.

In 2025, however, the Government's policy changed dramatically.  The DHS revised its § 1225 designation to "apply expedited removal *to the fullest extent authorized by statute*." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) (emphasis added). The Secretary of Homeland Security memorandum directed federal immigration officers to "consider . . . whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied."  Dkt. No. 1 at ¶ 33.  Officers are encouraged to "take steps to terminate any ongoing removal proceeding and/or any active parole status."[2]  *Id.*  The memorandum states that DHS shall take the actions contemplated by the memorandum "in a manner that takes account of legitimate reliance interests," but states that "the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner."  Huffman Memorandum (Jan. 23, 2025).

Since mid-May of 2025, the Department of Homeland Security has made a practice of appearing at regular removal proceedings in immigration court, moving to dismiss the

---

[2] Section 1226(a) provides for discretionary "conditional parole" for non-dangerous noncitizens who do not present a flight risk; § 1182(d)(5)(A) separately provides for a case-by-case "parole" for "urgent humanitarian reasons or significant public benefit."

1  proceedings, and then re-arresting the individual in order to place them in expedited removal

2  proceedings.  Dkt. No. 1 at ¶¶ 35–40.  If the immigration judge does not dismiss the full removal

3  proceedings, ICE still makes an arrest, apparently in reliance on § 1225(b)(2)'s detention

4  provision.

5

6              **II.        FACTUAL BACKGROUND**

7              Ms. Salcedo Aceros is a noncitizen who fled Columbia after being kidnapped and

8  threatened with death.  Dkt. No. 5-2.  On June 10, 2024, border patrol picked up Ms. Salcedo

9  Aceros near Otay Mesa, California.  Dkt. No. 16-1.  She admitted to the border patrol officers that

10  she did not have valid immigration documents and that she had crossed the border without being

11  inspected by an immigration officer at a designated port of entry.  *Id.*  She was charged as

12  removable under Section 212(a)(6)(A)(i) as "an alien present in the United States without being

13  admitted or paroled, or who arrived in the United States at any time or place other than as

14  designated by the Attorney General."  Dkt. No. 17-2.  Border patrol determined that she did "not

15  appear to be a threat to national security, border security, or public safety."  Dkt. No. 17-2.  She

16  also had "no prior criminal history."  *Id.*  Border patrol therefore released her on her own

17  recognizance with a Notice to Appear "due to lack of bed space."  *Id.*  The Notice to Appear

18  directed her to appear before an immigration judge in San Francisco.  Dkt. No. 16-2.  She was also

19  provided with a Form I-220A, which stated that she had been "placed in removal proceedings" and

20  released "[i]n accordance with section 236 [§1226] of the Immigration and Nationality Act and the

21  applicable provisions of Title 8 of the Code of Federal Regulations."   Dkt. No. 17-1.

22              Following her release by federal agents, Ms. Salcedo Aceros moved to Castro Valley,

23  California.  *Id.*  Since that time, she has complied with supervision requirements and attended

24  required check-ins.  *Id.*  In February, 2025 she was injured in a car accident, which she is still

25  recovering from.  Dkt. No. 5-2 at 3.  In June 2025, she filed an application for asylum based on

26  gender-based violence.  Dkt. No. 1 at 12.

27              On August 15, Ms. Salcedo Aceros appeared at San Francisco Immigration Court for her

28  scheduled hearing before an immigration judge.  *Id.*  At the hearing, the government orally moved

United States District Court
Northern District of California

7

to dismiss the full removal proceedings.  Dkt. No. 5-1 at 2.  The immigration judge deferred ruling to allow petitioner time to respond and set a merits hearing on her asylum application for February 29, 2028.  Dkt. No. 1 at 12.  When Ms. Salcedo Aceros exited the courtroom after her hearing, ICE agents arrested her in the hallway.  Dkt. No. 5-1 at 3.

The same day she was detained, Ms. Salcedo Aceros filed a petition for habeas corpus and a motion for a TRO, which the Court granted on August 16, 2025.  Dkt. No. 6.  The Government was ordered to release Ms. Salcedo Aceros from the Government's custody, to refrain from re-detaining Ms. Salcedo Aceros without notice and a pre-deprivation hearing before a neutral decisionmaker, and to refrain from removing Ms. Salcedo Aceros from the United States.  Dkt. No. 6.  On August 25, the Court extended the TRO to September 6, and on September 4, after hearing argument from the parties, the Court extended the TRO to September 13.  Dkt. No. 18; Dkt. No. 20.

### III.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in h[er] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008).  "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor and the other two Winter factors are satisfied.'"  *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).  The final two factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

## IV.    DUE PROCESS CLAIM

A.    Ms. Salcedo Aceros Is Likely to Succeed on the Merits, or at Least Raises Serious Questions

The Due Process Clause protects all persons within the United States from being "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.  It is settled law that the Due Process clause applies to noncitizens within the United States "whether their presence here is lawful, unlawful, temporary, or permanent."  *Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S. Ct. 2491, 2500, 150 L. Ed. 2d 653 (2001); *Trump v. J. G. G.*, –––– U.S. ––––, 145 S. Ct. 1003, 1006, 221 L.Ed.2d 529 (2025) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings.").

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 2600, 33 L. Ed. 2d 484 (1972).  The constitution typically "requires some kind of a hearing *before* the State deprives a person of liberty or property."  *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).  This is particularly true when the interest is in liberty, the loss of which cannot fully be compensated after the fact.

To determine what procedures are required, courts apply the three-part test of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  The Government argues that the *Mathews* test does not apply because the Supreme Court has not used the test to address due process claims raised by noncitizens.  *See Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022) ("[T]he Supreme Court when confronted with constitutional challenges to immigration detention has not resolved them through express application of Mathews.").  However, the Ninth Circuit has "assume[d] without deciding" that *Mathews* applies in the immigration detention context, *Diaz*, 53 F.4th at 1206-07; *see also Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at n. 2 (N.D. Cal. July 24, 2025) (collecting cases where the Ninth Circuit has applied Matthews in due process challenges to removal proceedings).  And many courts in this district have applied the *Mathews* test to noncitizens in circumstances similar or identical to those here. *See e.g.*, *Calderon v. Kaiser*, No. 25-CV-06695-AMO, 2025 WL 2430609, at *3 (N.D. Cal. Aug. 22, 2025); *Ramirez Clavijo v.*

*Kaiser*, No. 25-CV-06248-BLF, 2025 WL 2419263, at *5 (N.D. Cal. Aug. 21, 2025); *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025); *Hernandez Nieves v. Kaiser*, No. 25-CV-06921-LB, 2025 WL 2533110, at *4 (N.D. Cal. Sept. 3, 2025).

The Government argues that noncitizens in Ms. Salcedo Aceros' position "cannot assert a protected property or liberty interest in additional procedures not provided by the statute." Dkt. No. 15. The Government's contention that Ms. Salcedo Aceros has no due process protections is not supported by the cases on which it relies. The Government cites *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) for the proposition that for noncitizens, "[w]hatever the procedure authorized by Congress . . . is due process." But this selective quotation omits the end of the sentence: "as far as an alien *denied entry* is concerned." *Id.* (emphasis added). Ms. Salcedo Aceros is not requesting additional due process to adjudicate denial of entry, and thus *Shaughnessy* does not apply. *See also Landon v. Plasencia*, 459 U.S.21, 32 (1982) (no constitutional rights regarding finding of *exclusion*).

The Government also cites *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 105 (2020), which likewise concerned the due process afforded to "aliens seeking initial entry" challenging their *exclusion*. In *Thuraissigiam*, the petitioner had "succeeded in making it 25 yards into U. S. territory" when he was detained under the expedited removal statute. *Id.* at 114. After an asylum officer and immigration judge determined that he lacked a "credible fear" and was thus eligible for immediate removal, the petitioner sought "a new opportunity to apply for asylum and other applicable forms of relief." *Id.* at 115. Notably, "[h]is petition made no mention of release from custody." *Id.* In denying his petition, the Supreme Court relied on the "sovereign prerogative" to "admit or exclude" aliens, which it held applied even to noncitizens "paroled elsewhere in the country for years pending removal." *Id.* at 139. Such petitioners had "only those rights *regarding admission* that Congress has provided by statute." *Id.* at 140 (emphasis added). *Thuraissigiam*'s holding concerns the right to additional due process sought over admission determinations. It does not address the due process rights of a noncitizen to remain free once released.

Those in Ms. Salcedo Aceros' position, a noncitizen granted the liberty of release pending

removal proceedings, have due process rights.  The breadth of those rights turns on the application

of the *Mathews* test.  *Mathews* requires consideration of three factors: (1) the private interest

affected; (2) the risk of an erroneous deprivation; and (3) the Government's interest.  *Mathews*,

424 U.S. at 335.  Here, all three factors suggest that Ms. Salcedo Aceros has a right to a pre-

detention hearing before a neutral arbiter.

### 1.    Ms. Salcedo Aceros Has a Liberty Interest

"Freedom from imprisonment—from government custody, detention, or other forms of

physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."

*Zadvydas*, 533 U.S. at 690.  "A protected liberty interest may arise from a conditional release from

physical restraint."  *Rodriguez v. Kaiser*, No. 1:25-cv-01111-KES-SAB (HC), 2025 U.S. Dist.

LEXIS 172756, at *8 (E.D. Cal. Sep. 4, 2025) (citing *Young v. Harper*, 520 U.S. 143, 147-49, 117

S. Ct. 1148, 137 L. Ed. 2d 270 (1997)).  "[E]ven when an initial decision to detain or release an

individual is discretionary, the government's subsequent release of the individual from custody

creates "an implicit promise" that the individual's liberty will be revoked only if they fail to abide

by the conditions of their release."  *Calderon v. Kaiser*, No. 25-CV-06695-AMO, 2025 WL

2430609, at *2 (N.D. Cal. Aug. 22, 2025) (citing *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)).

"The fact that a decision-making process involves discretion does not prevent an individual from

having a protectable liberty interest."  *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal.

2019).  Accordingly, a noncitizen released from custody pending removal proceedings has a

protected liberty interest in remaining out of custody.  *See e.g.*, *Ramirez Clavijo v. Kaiser*, 25-cv-

06248-BLF, at 6 (N.D. Cal. Aug. 21, 2025) (collecting cases); *Romero v. Kaiser*, No. 22-cv-

02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022).

In this case, Ms. Salcedo Aceros gained a liberty interest in her continued freedom when

the DHS elected to release her on her own recognizance.  Under *Morrissey*, this release implied a

promise that she would not be re-detained so long as she abided by the terms of her release.  *See*

*e.g., Calderon*, 2025 WL 2430609, at *2.  That promise accords with the protections afforded by

statute.

Ms. Salcedo Aceros was released "[i]n accordance with section 236 [§1226] of the Immigration and Nationality Act and the applicable provisions of Title 8 of the Code of Federal Regulations." Dkt. No. 17-1.   Under federal regulation, DHS was authorized to release her under §1226 only upon a determination that "such release would not pose a danger to property or persons" and that she was "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). DHS's decisions to release Ms. Salcedo Aceros thus reflected "a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).   DHS's file confirms that Ms. Salcedo Aceros had "no prior criminal history" and did "not appear to be a threat to national security, border security, or public safety." Dkt. No. 16-1.   The Government does not argue that circumstances have changed since it determined that Ms. Salcedo Aceros was neither a flight risk nor a danger to the community.   Indeed, the record before the Court indicates that Ms. Salcedo Aceros has complied with the obligations set forth in her Notice to Appear, including by appearing for the immigration hearing at which she was arrested.

A noncitizen detained under Section § 1226(a) has the right to contest their custody determination before an immigration judge, at which time the government bears the burden to prove that the detention is justified. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) *citing* 8 C.F.R. §§ 236.1(d)(1); 8 CFR 1003.19; *dos Santos v. Noem*, No. 1:25-cv-12052-JEK, 2025 U.S. Dist. LEXIS 157488, at *2 (D. Mass. Aug. 14, 2025).   This right becomes available at the "outset of detention." *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 C.F.R. § 236.1(d)(1)). Ms. Salcedo Aceros was rightfully released under Section 1226 since she was neither a danger nor a flight risk, as a bond hearing would likely have been found, and she was entitled to maintain her freedom while removal proceedings were ongoing absent a change in circumstances. *See Saravia*, 280 F. Supp. 3d at 1176.

The Government seeks to avoid the strictures of 1226(a) with its bond hearing protections by asserting Mr. Salcedo Aceros has no protected liberty interest (or any statutory rights under §1226) because she is subject to a different detention authority — § 1225(b) — which does not contemplate pre-detention hearings.   Dkt. No. 15 at 8.

The Government concedes that Ms. Salcedo Aceros is currently in full removal proceedings under Section 1229, and that while those proceedings are live, she cannot be simultaneously subjected to Section 1225(b)(1)'s expedited removal proceedings.[3]  But the Government asserts that it may nevertheless detain Ms. Salcedo Aceros under Section 1225(b)(2). The Government argues that this provision provides for mandatory detention even while full removal proceedings are ongoing for any noncitizen considered an "applicants for admission" who does not fall under § 1225(b)(1).  In other words, the Government's position is that whether Ms. Salcedo Aceros is in full removal proceedings or not, and regardless of the authority under which it initially detained her, it may at any time subject her to detention without the possibility of release on bond because she is an "applicant for admission" who is "seeking admission" and thus subject mandatory detention under § 1225(b)(2).

> a.    The Government's Attempt to Switch from Section 1226(a) to Section
> 1225(b)(2)

The Government's argument does not hold.  As a preliminary matter, whether the Government may have had the power to detain Ms. Salcedo Aceros under 1225(b), the reality is that the detention authority consistently applied by the government to Ms. Salcedo Aceros since her arrival in the United States has always been § 1226.  In 2024, the Government placed Ms. Salcedo Aceros in normal removal proceedings under Sections §1229, not §1225(b)(1), and chose to release her on conditional parole under §1226(a), not hold her in detention under §1225(b)(2). These actions created a reliance interest in her continued freedom, so long as she abided by the terms of her release.  *See e.g.*, *Calderon v. Kaiser*, No. 25-CV-06695-AMO, 2025 WL 2430609, at *3 (N.D. Cal. Aug. 22, 2025) (recognizing a noncitizen's protected interest in continued liberty);

---

[3] A district court recently stayed the Government's application of Section 1225(b)(1)'s expedited removal proceedings to "people living in the interior of the country who have not previously been subject to expedited removal," which would include Ms. Salcedo Aceros.  *See Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 LX 389496 (D.D.C. Aug. 29, 2025).  While the stay is operative, the Government may not subject Ms. Salcedo Aceros to expedited removal even if full removal proceedings against her are dismissed.

1    *see also* Huffman Memorandum (Jan. 23, 2025) (recognizing that noncitizens granted

2    discretionary parole have "reliance interests").

3      Sections 1226(a) and 1225(b) cannot be applied simultaneously.  Their detention regimes

4    are facially inconsistent: one provides for discretionary release with procedural protections, while

5    the other mandates detention without discretion.  It is not possible for Ms. Salcedo Aceros to be

6    simultaneously subject to both detention regimes. She was and is subject to Section 1226(a), not

7    1225(b).

8      Ms. Aceros enjoys a liberty interest under § 1226(a) and the procedural protections

9    thereunder that cannot be unilaterally abrogated without process by the Government simply

10    "switching tracks."  *See Lopez Benitez v. Francis*, No. 25 CIV. 5937 (DEH), 2025 WL 2371588,

11    at *5 (S.D.N.Y. Aug. 13, 2025) (refusing to credit the Government's post hoc litigation position

12    that its detention was under 1225(b) when it had consistently treated the petitioner as subject to

13    1226).

14

15       b. The Limit of the Government's Authority under Section 1225(b)(2)

16      There is another reason why the Government cannot simply switch tracks from Section

17    1226(a) to 1225(b)(2) to detain Ms. Salcedo Aceros.  Section 1225(b)(2) does not give the

18    Government the broad detention power it now claims.

19      Ms. Salcedo Aceros argues that § 1225(b)(2) does not apply to noncitizens like her, who

20    have been released by DHS on their own recognizance into the interior of the country.  Dkt. No.

21    17 at 4.  A number of district courts that have examined this issue in recent months have so held.

22    These courts have rejected the Government's expansive construction of §1225(b)(2), which would

23    allow it to detain without a hearing virtually any noncitizen not lawfully admitted.  These courts

24    examined the text, structure, agency application, and legislative history of 1225(b)(2) and

25    concluded that it applies only to noncitizens "seeking admission," a category that does not include

26    noncitizens like Ms. Salcedo Aceros, living in the interior of the country.  *See Gomes v. Hyde*, No.

27    1:25-CV-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025) ("[T]he plain text of

28    Sections 1225 and 1226, together with the structure of the larger statutory scheme, indicates that

United States District Court
Northern District of California

1    Section 1225(b)(2) does not apply to noncitizens who are arrested on a warrant issued by the

2    Attorney General while residing in the United States."); *Lopez Benitez v. Francis*, No. 25 CIV.

3    5937 (DEH), 2025 WL 2371588, at *5 (S.D.N.Y. Aug. 13, 2025) (holding 1225(b)(2) "clearly"

4    not applicable to noncitizens who have resided in the country for years); *Rosado v. Figueroa*, No.

5    CV 25-02157 PHX DLR (CDB), 2025 U.S. Dist. LEXIS 156344, at *29 (D. Ariz. Aug. 11, 2025)

6    (finding that the Government's "selective reading" of 1225(b)(2) "violates the rule against

7    surplusage and negates the plain meaning of the text"); *Martinez v. Hyde*, No. CV 25-11613-

8    BEM, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025) (rejecting the Government's "novel

9    interpretation" that 1225(b) applies to noncitizens detained while present in the United States);

10   *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1261 (W.D. Wash. 2025) (holding that Section 1226,

11   not 1225(b)(2), governed inadmissible noncitizens residing in the country).

12       The Government has not pointed to a single district court that has agreed with its

13   construction of 1225(b)(2).  Instead, the Government points to a recent BIA decision agreeing

14   with its interpretation.  Dkt. No. 22 (citing *Matter of Jonathan Javier Yajure Hurtado*, 29 I & N

15   Dec. 216 (BIA 2025)).  There, the BIA held that Section 1225(b)(2) prescribes mandatory

16   detention for all inadmissible noncitizens living in the United States.  For the reasons discussed

17   below, the Court finds the conclusion of the district courts more persuasive than the BIA's new

18   ruling.

19       First, the BIA decision is entitled to little deference.  *Loper Bright Enters. v. Raimondo*,

20   603 U.S. 369, 400 (2024) (observing that while "agencies have no special competence in resolving

21   statutory ambiguities," "[c]ourts do").  Under *Skidmore*, the "weight of such a judgment in a

22   particular case will depend upon the thoroughness evident in its consideration, the validity of its

23   reasoning, its consistency with earlier and later pronouncements, and all those factors which give

24   it power to persuade, if lacking power to control."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140

25   (1944).  In this regard, the BIA's current position is inconsistent with its earlier pronouncements.

26   Prior to its September 5 decision, the BIA issued three non-precedential decisions taking the

27   *opposite* position.  *See Martinez*, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025).  In one

28   decision, the Board even stated that it was "unaware of any precedent" that would support the

1    Government's position.  *Id.*  Under *Loper*, the Court has no obligation to defer to the BIA's view,

2    particularly when that view has not "remained consistent over time."  *Loper*, 603 U.S. at 386; *see*

3    *also Skidmore*, 323 U.S. at 140.

4         Moreover, the BIA's reasoning lacks persuasive power for several reasons.

5                                              i.

6         As with any question of statutory interpretation, the Court begins with the relevant

7    statutory provisions. § 1225(a) defines an applicant for admission as:

8

9         "[a]n alien present in the United States who has not been admitted or who arrives in the
          United States (whether or not at a designated port of arrival and including an alien who is
10        brought to the United States after having been interdicted in international or United States
          waters) . . ."

11

12        § 1225(b)(2)(A) states:

13        "[I]n the case of an alien who is an applicant for admission, if the examining immigration
          officer determines that an alien seeking admission is not clearly and beyond a doubt
14        entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of
          this title."

15

16        The Government argues and the BIA agreed that every noncitizen who has not been

17   lawfully admitted to the United States continues to be a noncitizen "seeking admission" and thus

18   subject to § 1225(b)(2).  In other words, it treats the phrases "applicant for admission" and

19   "seeking admission" as synonymous.

20        But this reading would render the phrase "seeking admission" in § 1225(b) superfluous.

21   To qualify for § 1225(b)(2), a noncitizen must (1) be an applicant for admission, (2) be "seeking

22   admission", and (3) be "not clearly and beyond a doubt entitled to be admitted."  If, as the

23   Government argues, all applicants for admission are deemed to be "seeking admission" for as long

24   as they remain applicants, then the phrase "seeking admission" would add nothing to the

25   provision.  This "violates the rule against surplusage."  *Lopez Benitez v. Francis*, No. 25 CIV.

26   5937 (DEH), 2025 WL 2371588, at *6 (S.D.N.Y. Aug. 13, 2025); *see also United States, ex rel.*

27   *Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432, 143 S.Ct. 1720, 216 L.Ed.2d 370 (2023)

28   ("[E]very clause and word of a statute should have meaning."); *TRW Inc. v. Andrews*, 534 U.S. 19,

United States District Court
Northern District of California

31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("[N]o clause, sentence, or word shall be superfluous, void, or insignificant.") (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)).

Moreover, the Government's and the BIA's reading of "seeking admission" is unnatural and ignores the tense of the term.  As one district court observed:

> "[S]omeone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as "seeking admission" to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as "seeking admission" (or "seeking" "lawful entry") at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there."

*Lopez Benitez*, 2025 WL 2371588, at *7.

                                                    ii.

Indeed, the Government's and BIA's position conflicts with the implementing regulation for § 1225(b).  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385-86 (2024) (implementing regulations may provide a "useful reference point for understanding a statutory scheme" when issued "contemporaneously").  8 C.F.R. § 235.3 describes Section 1225(b)(2) as applying to "any *arriving alien* who appears to the inspecting officer to be inadmissible." (Emphasis added.)  The regulation thus contemplates that "applicants *seeking admission*" are a subset of applicants "roughly interchangeable" with "arriving aliens."  *Martinez v. Hyde*, No. CV 25-11613-BEM, 2025 WL 2084238, at *6 (D. Mass. July 24, 2025).  "Arriving aliens" are specifically defined by regulation as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2.  This plainly does not describe Ms. Salcedo Aceros.  Indeed, the DHS's Notice to Appear form similarly distinguishes between "arriving alien" and "alien present in the United States who has not been admitted or paroled." Dkt. No. 16-2.

☐ You are an arriving alien.
☒ You are an alien present in the United States who has not been admitted or paroled.
☐ You have been admitted to the United States, but are removable for the reasons stated below.

These regulations and forms presume that the term alien "seeking admission" has limited

1  application, not the sweeping construction given to it by the BIA.

2                              *iii.*

3         Another "fundamental canon of statutory construction" is that "the words of a statute must

4  be read in their context and with a view to their place in the overall statutory scheme." *Gundy v.*

5  *United States*, 588 U.S. 128, 140–41, 139 S.Ct. 2116, 204 L.Ed.2d 522 (2019).  Here, the

6  Government's interpretation would "nullify" a recent amendment to the immigration statutes.  *See*

7  *Gomes v. Hyde*, No. 1:25-CV-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025).

8  Section 1226 generally establishes a discretionary detention framework, but provides that for

9  certain noncitizens, detention is mandatory.  Section 1226(c).  In January of *this year*, Congress

10  amended Section 1226 to add an additional category of citizens subject to mandatory detention.

11  Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025).  This category includes noncitizens who

12  are (1) inadmissible under 1182(6)(A) [present without admission or parole], (6)(C)

13  [misrepresentation], or (7)(A) [lack of proper documentation] *and* (2) have been charged with one

14  of certain enumerated crimes.  *Id.*  If the Government's view is correct, however, all noncitizens

15  who are inadmissible are *already* subject to mandatory detention under § 1225(b)(2), whether or

16  not they have been charged with a qualifying crime and thus are subject to § 1226(c).  This view

17  would render the Laken Riley Act a meaningless amendment, since it would have prescribed

18  mandatory detention for noncitizens already subject to it.  But "[w]hen Congress acts to amend a

19  statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*,

20  514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995); *see also Marx v. Gen. Revenue*

21  *Corp.*, 568 U.S. 371, 386, 133 S.Ct. 1166, 185 L.Ed.2d 242 (2013) ("[T]he canon against

22  surplusage is strongest when an interpretation would render superfluous another part of the same

23  statutory scheme.").  If Congress amended Section 1226 to create mandatory detention for certain

24  inadmissible noncitizens, it follows that those noncitizens were not already subject to mandatory

25  detention.  Thus, the scope of Section 1225(b)(2) cannot be as broad as the government argues.

26                              *iv.*

27         In addressing whether a noncitizen who has lived for years within the United States can be

28  considered "seeking admission," the BIA expressed concern that if a noncitizen is not "admitted"

United States District Court
Northern District of California

to the United States but is not deemed "seeking admission," then the noncitizen's legal status would present a "legal conundrum." *Id.* at 221. The BIA did not further elaborate, but presumably its concern was that such an individual would have no legal status under the immigration code. This concern is misplaced. The statute explicitly provides a term of art for someone who is not "admitted" but is not *necessarily* "seeking admission": such noncitizens fall into the broader category of "applicants for admission." As noted, otherwise the language in 1225(b)(2), which treats noncitizens "seeking admission" as a subset of "applicants for admission" would be superfluous. All "applicants for admission" have some legal status whether they belong to the subset of those seeking admissions or not.

The BIA also reasoned that petitioner's argument for a narrower construction of Section 1225(b)(2) left unanswered which applicants for admission would be covered by that section if applicants for admission who have lived within the United States for years are excluded from its reach. *Id.* In other words, the BIA believed that an interpretation of § 1225(b)(2) that does not cover all applicants for admission would render § 1225(b)(2) an empty set. Not so. Most obviously, § 1225(b)(2) applies to arriving noncitizens who are inadmissible on grounds other than 8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7) (which are the grounds that put an arriving noncitizen on the track for expedited removal). The statute governing inadmissibility lists ten grounds for inadmissibility, many of which have distinct sub-grounds. *See* 8 U.S.C. § 1182(a)(1)-(10). There are thus arriving noncitizens inadmissible on these other bases who would fall under Section 1225(b)(2), as opposed to Section 1225(b)(1). Section 1225(b)(2) would not be a null set even if narrowly construed.

*v.*

The BIA acknowledged that the Government's interpretation of § 1225(b)(2) makes it redundant with § 1226(c)'s mandatory detention provisions, and renders superfluous Congress' recent amendment, but nevertheless maintained that this redundant interpretation is not problematic. But as noted above, this conclusion is inconsistent with conventional rules of statutory interpretation. Further, the BIA failed to recognize that interpreting §1225(b)(2) as district courts have done would not render *any* section of the immigration code superfluous.

United States District Court
Northern District of California

1    Under the district courts' interpretation, Section 1225(b)(2) has a role within the statutory

2    framework, applying to arriving aliens inadmissible on grounds other than the two that allow for

3    expedited removal, as noted above.

4                            *vi.*

5           The BIA's consideration of the legislative history of the Illegal Immigration Reform and

6    Immigrant Responsibility Act of 1996 is also unpersuasive.  Prior to 1996, the immigration laws

7    distinguished individuals based on "entry" rather than admission.  *Hing Sum v. Holder*, 602 F.3d

8    1092, 1099 (9th Cir. 2010).  Noncitizens who had effected an "entry" into the United States were

9    subject to deportation proceedings, while those who had not made an "entry" were subject to

10   "more summary" exclusion proceedings.  *Id.* at 1099–100 (9th Cir. 2010).  To remedy this, the

11   IIRIRA substituted "admission for entry" and replaced deportation and exclusion proceedings with

12   a general "removal" proceeding.  *Id.*  In the BIA's view, this indicates that in enacting IIRIRA

13   Congress sought to create completely level treatment for noncitizens in removal proceedings,

14   regardless of whether they are living in the United States or encountered at the border.  It would

15   therefore follow that a provision like § 1225(b)(2) would not differentiate between noncitizens

16   based on their presence in the United States, or the length of that presence.

17          But the BIA erred in its analysis by identifying *one* of Congress' concerns in enacting

18   IIRIRA and then treating it as Congress's sole concern driving the statute.  Congress was indeed

19   focused on ensuring that there was "no reward for illegal immigrants or visa overstayers."  H.R.

20   REP. 104-469, 12.  But Congress addressed this concern: the IIRIRA consolidated exclusion and

21   deportation procedures into a single procedure and provided that noncitizens "who enter illegally

22   or who overstay the period of authorized admission will have a greater burden of proof in removal

23   proceedings and will face tougher standards for most discretionary immigration benefits, such as

24   suspension of removal and work authorization." *Id.*

25          In making these changes, Congress did not fully disrupt the old system, including the

26   system of detention and release.  In fact, according to the legislative record, "Section 236(a)

27   [1226(a)] restates the current provisions in section 242(a)(1) regarding the authority of the

28   Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United

States." H.R. REP. 104-469, 229.  Congress' concern about adjusting the law in some respects to reduce inequities in the removal process did not mean Congress intended to entirely up-end the existing detention regime by subjecting *all* inadmissible noncitizens to mandatory detention, a seismic shift in the established policy and practice of allowing discretionary release under Section 1226(a) – the scope of which Congress did not alter.  *See Vazquez v. Bostock*, 779 F. Supp. 3d 1239 (W.D. Wash. 2025) (citing H.R. Rep. No. 104-469, pt. 1, at 229).

***

Accordingly, the Court finds the well-reasoned decisions of the many district courts that have rejected the Government's expansive view of 1225(b)(2) far more persuasive than the new BIA ruling, a ruling at odds with its prior decisions and DHS's actions over the past thirty years.

### c.  Conclusion.

The Court concludes that even if the Government theoretically could, without process, switch detention regimes in the middle of the stream, § 1225(b)(2) provides no legal basis for the Government's detention of Ms. Salcedo Aceros.  Thus, Ms. Salcedo Aceros has significant private interest in her continued liberty.  The first factor therefore favors Ms. Salcedo Aceros.

### 2.  Risk of Erroneous Deprivation

The second factor, the risk of erroneous deprivation, also weighs in Ms. Salcedo Aceros' favor.  Once a liberty interest is established, the question is whether process – a hearing – would lessen the risk of an erroneous detention.  Where an individual has not received a bond or redetermination hearing, "the risk of an erroneous deprivation [of liberty] is high."  *Singh v. Andrews*, No. 1:25-CV-00801, 2025 WL 1918679, at *7 (E.D. Cal. July 11, 2025).  Here, the risk of erroneous deprivation is high because a hearing will likely reveal Ms. Salcedo Aceros presents no risk to public safety and no risk of non-appearance.  Indeed, given her performance on release, the Government has not argued otherwise, instead resting on Section 1225's mandatory detention provisions as a matter of law.  The second factor therefore favors Ms. Salcedo Aceros.

United States District Court
Northern District of California

1

2            3.        The Government's Interest

3            Finally, the Government has failed to show any countervailing interest against a providing

4    a pre-detention hearing.  "In immigration court, custody hearings are routine and impose a

5    'minimal' cost.  *Singh*, 2025 WL 1918679, at *8 (citing *Doe v. Becerra*, No. 2:25-cv-00647-

6    DJC-DMC, 2025 WL 691664, at *2 (E.D. Cal. Mar. 3, 2025).  There is no concern with a hearing

7    delaying the Government's efforts to remove Ms. Salcedo Aceros either.  Any such delay would

8    be minimal, and in any case, Ms. Salcedo Aceros is currently subject to full removal proceedings

9    and scheduled for an asylum hearing in *2028*.  Even if she could be brought into expedited

10   removal, a pre-deprivation bond hearing will not interfere with the proceedings.  Whether the

11   Government conducts a pre-detention hearing – or, indeed, whether Ms. Salcedo Aceros is in

12   detention or not – will not obstruct the removal process.  And detention for its own sake is not a

13   legitimate governmental interest.  *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921,

14   at *5 (N.D. Cal. July 24, 2025) ("Detention for its own sake, to meet an administrative quota, or

15   because the government has not yet established constitutionally required pre-detention procedures

16   is not a legitimate government interest.").

17

18           4.        A Pre-Deprivation Hearing Is Warranted

19           The Court notes that the Section 1226 framework typically provides for post-detention,

20   rather than pre-deprivation, bond hearings.  If Section 1226 and its regulations are followed, this

21   provides for sufficient process, as detentions will only be made upon an initial DHS determination

22   that an individual is a flight risk or poses a danger to the community.  *See Diaz v. Garland*, 53

23   F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)).  Due to the Government's

24   erroneous position that Ms. Salcedo Aceros is subject to mandatory detention, however, it

25   detained her despite its own determination that she presented no such risks, and without any

26   finding of changed circumstances.  *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal.

27   2017).  Under these circumstances, given the government's conduct, the substantial liberty

28   interests held by Mr. Salcedo Aceros, and the fact that the government has no evidence and does

not contend that Ms. Salcedo Aceros presents and risk of flight or to public safety, a *pre-deprivation* bond hearing is warranted.  Indeed, every court in this district to address the issue has so held.  *See e.g., Calderon v. Kaiser*, No. 25-CV-06695-AMO, 2025 WL 2430609, at *4 (N.D. Cal. Aug. 22, 2025) (ordering pre-deprivation hearing before any detention); *Ramirez Clavijo v. Kaiser*, No. 25-CV-06248-BLF, 2025 WL 2419263, at *9 (N.D. Cal. Aug. 21, 2025) (same); *Diaz v. Kaiser*, No. 3:25-CV-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025) (same).

***

As each *Mathew* factor favors Ms. Salcedo Aceros, she has shown a likelihood of success on the merits that due process entitles her to a bond hearing before a neutral arbiter prior to any re-arrest.  Given that, as discussed below, the balance of equities tips sharply in Ms. Salcedo Aceros' favor, she also satisfies this factor even if she has only raised serious questions as to the merits of her claim.

B.    Ms. Salcedo Aceros Faces Irreparable Harm

Ms. Salcedo Aceros is likely to suffer irreparable harm in the absence of preliminary injunctive relief.  She is currently out of ICE custody only due to court order and there is no reason to believe that the government will not immediately re-detain her as soon as the temporary restraining order expires.  "Deprivation of physical liberty by detention constitutes irreparable harm." *Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018); *see also Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.").  "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005).  Unconstitutional deprivation of liberty satisfies the burden of irreparable harm

Further, as a practical matter, Ms. Salcedo Aceros is likely to suffer serious medical consequences if re-detained.  The Ninth Circuit has recognized the "irreparable harms imposed on anyone subject to immigration detention," including "subpar medical and psychiatric care in ICE

United States District Court
Northern District of California

detention facilities.  *Hernandez*, 872 F.3d at 995.  Ms. Salcedo Aceros suffered a serious injury in a recent car accident.  She still experiences acute and chronic back pain from the injury, for which she is currently scheduled to receive injections.  During her detention at 630 Sansome, Ms. Salcedo Aceros reported that the cold conditions in the detention facility were aggravating her pain.  Detention would likely exacerbate Ms. Salcedo Aceros' injuries and prevent her from receiving her scheduled treatments.  These consequences to Ms. Salcedo Aceros' health are also significant and irreparable.[4]

C.    The Balance of Equities and the Public Interest Favor Ms. Salcedo Aceros

"[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering."  *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up); *see also Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) (quoting *Padilla v. Immigration & Customs Enforcement*, 953 F.3d 1134, 1147–48 (9th Cir. 2020)) ("It is always in the public interest to prevent the violation of a party's constitutional rights."); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.").  Further, the government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).  "Faced with ... a conflict between minimally costly procedures and preventable human suffering, [the Court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Singh*, 2025 WL 1918679, at *9 (quoting *Hernandez*, 872 F.3d at 996).

The only potential injury the government faces is a short delay in detaining Ms. Salcedo

---

[4] The Government claims Ms. Salcedo Aceros' medical claim is "largely conclusory" and "contradicted by the record."  Dkt. No. 15 at 13.  In support, the Government points to a note in Ms. Salcedo Aceros' file that she is "in good health and taking no medication."  Dkt. No. 16-3.  It is unclear from the face of the document what time period this statement refers to.  In any case, Ms. Salcedo Aceros does not claim to be taking medication—she states that she has scheduled injections to treat pain from a specific injury.

Aceros if it ultimately demonstrates to a neutral decisionmaker by the preponderance of the evidence that her detention is necessary to prevent danger to the community or flight.  *See Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at *7 (N.D. Cal. July 24, 2025); *See Jorge M. F*, 2021 WL 783561; *Diaz*, 2025 WL 1676854.  While the Government cites as its interest "the steady enforcement of its immigration laws," it does not explain how holding a pre-detention bond hearing interferes with this end.  Dkt. No. 15 at 14.  Indeed, to the contrary, the procedures undertaken by DHS of summarily detaining noncitizens who dutifully appear at ICE offices and immigration courts undermines legitimate government interests.  As the DHS has previously recognized, "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses, and, as a result, impair the fair administration of justice."  Dkt. No. 1 ¶ 45 (citing April 27, 2021 Civil Immigration Enforcement Actions in or Near Courthouses memorandum).  If anything, it is the Government that has thrown into turmoil the steady enforcement of immigration law through repeated, highly public arrests in courtroom hallways.

Given that the Government faces no real injury from abiding by the Constitution, the balance of equities tips sharply in Ms. Salcedo Aceros' favor.

## V.    SUBSTANTIVE DUE PROCESS CLAIM

Granting Ms. Salcedo Aceros' preliminary injunction and enjoining the government from detaining her "obviates the threat of any imminent deprivation of her substantive due process rights," so the Court need not consider her substantive due process claims at this stage.  *See Pinchi*, 2025 WL 2084921, at n.1; *accord Calderon*, 2025 WL 2430609, at n1.

# VI.    <u>CONCLUSION</u>

For the forgoing reasons, Ms. Salcedo Aceros' request for a preliminary injunction is **GRANTED**. The Government is **ENJOINED AND RESTRAINED** from

(1) Re-detaining Petitioner without a pre-deprivation hearing before a neutral decisionmaker; and

(2) Removing Petitioner from the United States pending these proceedings.

**IT IS SO ORDERED**.

Dated: September 12, 2025

_____
EDWARD M. CHEN
United States District Judge